UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

CENTRAL DIVISION



FILED

OCT 24 2017

CLERK

| | |
|---|---|
| JOHN N. NEWELL,<br><br>Plaintiff,<br><br>vs.<br><br>ROBERT M. SPEER, ACTING SECRETARY OF THE ARMY; AND THE UNITED STATES ARMY CORPS OF ENGINEERS, AGENCY,<br><br>Defendants. | 3:15-CV-3006-RAL<br><br><br>OPINION AND ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT |

Plaintiff John Newell (Newell) sued his employer, the United States Army Corps of Engineers and John McHugh,[1] the Secretary of the Army (collectively the Corps) alleging claims of race discrimination, disparate treatment, retaliation, and hostile work environment under Title VII. Doc. 1.[2] Newell had filed a prior suit against the Corps with similar allegations based on different factual circumstances. Doc. 1, CIV 14-3005-RAL. This Court consolidated the two cases on Newell's motion. Doc. 8; Doc. 19, CIV 14-3005-RAL. Newell seeks compensatory damages and all damages allowed under Title VII, as well as costs and disbursements. Doc. 1 at 5; Doc. 1 at 9, CIV 14-3005-RAL. The Corps moved for summary judgment on all claims, Doc. 18, which Newell opposed, Doc. 26. This Court in a previous opinion and order granted the Corps' motion for summary judgment on all claims except the hostile work environment and constructive discharge claims, deferring consideration of those issues until Newell's pending Equal Employment Opportunity (EEO) claims had been resolved and a Final Agency Decision (FAD) from the Department of the Army had been issued. Doc. 33. The Department of the

---

[1] Pursuant to Fed. R. Civ. P. 25(d), a public officer's successor is automatically substituted as a party. Robert M. Speer became the Acting Secretary of the Army on January 20, 2017.

[2] This Court uses Doc. followed by a number to refer to the document number of pleadings filed in the Case Management/Electric Case Filing System in this case, CIV 15-3006-RAL. When referring to a document number in Newell's other case, the case number CIV 14-3005-RAL will be specified.

Army issued a FAD resolving Newell's outstanding EEO claims on January 17, 2017. Doc. 41-1. The Corps moved for summary judgment on the remaining claims, Doc. 34, and Newell opposed that motion. Doc. 46. For the reasons explained below, this Court grants the Corps' motion for summary judgment on all remaining claims.

## I.    Facts Not Subject to Genuine Dispute[3]

Under Local Rule 56.1, Defendants filed a Statement of Undisputed Material Facts. Doc. 20. Newell appropriately responded by filing Plaintiff's Statement of Undisputed Material Facts, Doc. 24, and Plaintiff's Statement of Disputed Material Facts, Doc. 25. After filing their most recent motion for summary judgment, Defendants filed a Supplemental Statement of Undisputed Material Facts, Doc. 36. Newell responded by filing Plaintiff's Second Responsive Statement of Material Facts, Doc. 45. This Court takes the facts in the light most favorable to Newell, as the non-moving party, and draws the facts primarily from the undisputed portion of Defendants' Statement of Undisputed Facts and Supplemental Statement of Undisputed Facts, Plaintiff's Statement of Undisputed Material Facts where supported by the record, Plaintiff's Statement of Disputed Material Facts where supported by the record, and Plaintiff's Second Responsive Statement of Material Facts where supported by the record. Docs. 20, 24, 25, 36, 45. The facts in this section are not subject to genuine dispute. This Opinion and Order incorporates additional facts and some matters that Newell considers to be true, but which the Corps appears to contest, in discussing Newell's arguments.

Newell is an African American male who has previously served in the United States Army. Doc. 25 at ¶¶ 2–3. Newell is the only African American employee of the Corps in the region where he works; there is an admitted lack of diversity in employees at the Corps' Oahe Project. Doc. 24 at ¶¶ 35–36; Doc. 31 at ¶¶ 35–36. Prior to his initial hiring at the Corps, Newell had worked for the United States Post Office, where he was in a supervisory position for a period of time. Doc. 20 at ¶ 6; Doc. 25 at ¶ 6.

---

[3] Because Newell's hostile work environment claim requires an evaluation of the totality of his work environment, much of this section is lifted from the Court's previous order granting the Corps' motion for summary judgement, Doc. 33. This section has been supplemented to include additional facts regarding the allegations addressed in this Opinion and Order.

In November 2005, Newell was hired as a Power Plant Electronics Mechanic Trainee III at the Oahe Project in Pierre, South Dakota. Doc. 20 at ¶ 30; Doc. 25 at ¶ 30. The Corps runs the Oahe Project, which is one of six main stem dam projects in the upper Missouri River Basin that produce hydroelectric power. Doc. 20 at ¶ 27; Doc. 25 at ¶ 27. The Corps provides an on-the-job trainee program through classroom training and correspondence courses, and Newell also trained with Electronic Mechanics at two of the Corps' other dam projects, the Garrison and Big Bend Projects. Doc. 20 at ¶ 31; Doc. 25 at ¶ 31. Rick Bartels (Bartels) was assigned to mentor Newell in his on-the-job training program; when Bartels was promoted from Power Plant Mechanic to Power Plant Operations and Maintenance (O & M) Supervisor, Bartels became Newell's direct line supervisor and continued to mentor Newell. Doc. 20 at ¶ 32; Doc. 25 at ¶ 32. Newell's second line supervisor was John Bartel (Bartel), the Oahe Dam Project Manager. Doc. 20 at ¶ 33; Doc. 25 at ¶ 33. Upon Bartel's retirement, Eric Stasch (Stasch), an Oahe Project engineer, was selected as Oahe Dam Project Manager. Doc. 20 at ¶ 33; Doc. 25 at ¶ 33. Jeffrey McCown (McCown) was hired as a Power Plant Mechanic in February 2006. Doc. 20 at ¶ 34; Doc. 25 at ¶ 34. Michael Magner (Magner) was hired as a Power Plant Electronics Mechanic and assigned to work with Newell in July 2006. Doc. 20 at ¶ 35; Doc. 25 at ¶ 35. In November 2006, Newell was promoted to Power Plant Electronics Mechanic Trainee IV. Doc. 25 at ¶ 36; Doc. 20 at ¶ 36.

In April 2007, Newell reported to Bartels inappropriate lunchroom talk among his co-workers. Doc. 20 at ¶ 37; Doc. 25 at ¶ 37. Bartels then spoke to shop employees about stopping all inappropriate language in the workplace and showed a training video, produced by the EEO Commission (EEOC), to all shop employees about the Corps' anti-discrimination policies. Doc. 20 at ¶¶ 37–39; Doc. 25 at ¶¶ 37–39.

In 2007, Newell and McCown applied for the Corps' Leadership Development Program, designed to develop leadership and management skills as distinct from other technical trainings; McCown was selected to participate in the program and successfully completed it. Doc. 24 at ¶¶ 37–38; Doc. 25 at ¶ 40; Doc. 31 at ¶¶ 37–38.

On July 23, 2007, Newell reported to Bartels a second incident of offensive lunchroom talk concerning race. Doc. 20 at ¶ 41; Doc. 25 at ¶ 41. Bartels informed Bartel, and Bartel verbally

3

reprimanded two employees involved, Magner and McCown, and made a written record of the incident. Doc. 20 at ¶ 42; Doc. 25 at ¶ 42. On September 6, 2007, Newell filed a formal complaint of race discrimination regarding this issue with the EEOC. Doc. 21-8. In 2010, Newell and the Corps entered into a settlement agreement regarding his complaint, under which Newell received benefits and agreed to "waive his right to pursue . . . judicial action . . . concerning the matters raised in this complaint." Doc. 21-11 at 2. As part of the settlement, Newell also agreed to withdraw "any other EEO complaints of reprisal filed prior to the date of this agreement," which was March 10, 2010. Doc. 21-11 at 2.

In 2010, Bartels retired from the position of O & M Supervisor, and Newell applied for this position. Doc. 20 at ¶¶ 55–56; Doc. 25 at ¶¶ 55–56. Newell was not hired for this position, and did not file a complaint with the EEOC alleging racial discrimination or retaliation in the hiring process. Doc. 20 at ¶¶ 57–58; Doc. 25 at ¶¶ 57–58.

In March 2011, an Assistant O & M position was advertised, and Newell applied for this position. Doc. 20 at ¶¶ 59–61; Doc. 25 at ¶¶ 59-61. Newell made the initial list of applicants, and was then part of the list of six applicants whose qualifications were rated on a defined matrix. Doc. 20 at ¶¶ 61–62; Doc. 25 at ¶¶ 61–62. The applicants for this position were rated by Stasch, the lead hiring official; Richard Spiger (Spiger), the O & M Supervisor at the Oahe Project; and Thomas Curran (Curran), the Operations Project Manager from the Ft. Randall Dam Project, an individual who had no knowledge of Newell, including no awareness of his race or prior EEO activity. Doc. 20 at ¶¶ 61–64; Doc. 25 at ¶¶ 61–64. Newell was ranked fifth of the six applicants by Stasch; fifth by Curran; and fourth by Spiger.[4] Doc. 20 at ¶¶ 62–64; Doc. 25 at ¶¶ 62–64. Because he was not one of the top three individuals ranked, he did not receive an interview and was not hired for the position. Doc. 20 at ¶¶ 65–67; Doc. 25 at ¶¶ 65–67. McCown instead was hired for the Assistant O & M position. Doc. 20 at ¶ 67; Doc. 25 at ¶ 67. Newell

---

[4] Newell claims that Spiger's inclusion on the hiring committee was improper because Spiger is a personal friend of McCown. Doc. 24 at ¶¶ 57–58; Doc. 31 at ¶¶ 57–58. However, Spiger ranked Newell higher than did the other two members of the committee. Newell does not criticize the other two choices for the hiring committee.

filed an EEO charge regarding this issue, alleging he was denied an interview because of race discrimination and reprisal for previous EEO activity. Doc. 20 at ¶ 68; Doc. 25 at ¶ 68.

After a visit to the Oahe Project from an Industrial Hygienist, in October 2011, Newell's workspace was relocated into a space shared with Magner. Doc. 20 at ¶ 72; Doc. 25 at ¶ 72. Shortly after, Spiger directed Newell and Magner to report daily to McCown to discuss the day's work assignments in an effort to increase productivity at the Oahe Project. Doc. 20 at ¶ 73; Doc. 25 at ¶ 73. Newell at this point requested that he be trained to fill in for Spiger when Spiger was away from the Oahe Project. Doc. 20 at ¶ 74; Doc. 25 at ¶ 74. Spiger denied this request because McCown was already trained and responsible for filling in for Spiger when Spiger was away. Doc. 20 at ¶ 74; Doc. 25 at ¶ 74.

For the period of February 2, 2011 to January 31, 2012, Newell received a performance rating of 3 (Successful), which did not entitle him to receive a cash bonus performance award. Doc. 20 at ¶ 92; Doc. 25 at ¶ 92. Newell filed a claim with the EEOC alleging racial discrimination for this performance rating. Doc. 20 at ¶ 93; Doc. 25 at ¶ 93. In 2014, the Army issued an FAD finding that there was no evidence of discriminatory animus in the performance rating. Doc. 20 at ¶¶ 100–01; Doc. 25 at ¶¶ 100–01.

On April 18, 2013, Stasch issued Newell a formal Letter of Reprimand for discussing the performance ratings of employees obtained through Newell's participating in prior EEO activity. Doc. 20 at ¶ 102; Doc. 25 at ¶ 102; Doc. 21-29 at 4–5. After a claim to the EEOC, the Administrative Law Judge (ALJ) found that this reprimand letter (as opposed to a verbal reprimand) constituted retaliatory discipline for Newell's prior EEO activity and required the reprimand letter be removed from Newell's file, compensatory damages be paid to Newell, and training be provided at the Oahe Project; the Army concurred in this finding with an FAD. Doc. 20 at ¶¶ 105–07; Doc. 25 at ¶¶ 105–07. Stasch did as instructed and gave Newell a verbal reprimand for the conduct rather than the formal Letter of Reprimand. Doc. 27-4 at 91. Also, in 2013, Newell was disciplined for being absent without leave (AWOL) from his position because he did not adhere to the Corps' written policy on leave time request.

Doc. 20 at ¶ 90; Doc. 25 at ¶ 90. Newell did not object to this discipline, nor did he file an EEO claim regarding the instance. Doc. 20 at ¶ 116; Doc. 25 at ¶ 116.

Newell made another complaint to the EEOC after McCown made comments during a weekly safety meeting that a Comprehensive Facility Review Team would be arriving and used language involving burning crucifixes and hangings[5] to indicate the severity and thoroughness of the group's review. Doc. 20 at ¶¶ 108–111; Doc. 25 at ¶¶ 108–111. The complaint was dismissed for failure to state a claim, because the statement did not constitute unlawful employment practice and Newell did not show any personal harm or loss of employment privileges or conditions because of the statement. Doc. 20 at ¶ 112; Doc. 21-35 (text of FAD dismissing complaint); Doc. 25 at ¶ 112.

In the Summer of 2013, a memo was circulated indicating that only one electronics mechanic position would be needed, but to avoid a Reduction in Force (RIF), one of the electronics mechanics would be assigned on a two-month shift to either the electric or mechanics shop. Doc. 24 at ¶ 117; Doc. 25 at ¶ 142; Doc. 28-1; Doc. 31 at ¶ 117. At this point, for various reasons, Bartels and Spiger told Magner not to share all of his information about the electronics mechanic position with Newell. Doc. 24 at ¶¶ 118–27; Doc. 31 at ¶¶ 118–27.

In June 2014, Newell was issued a Notice of Proposed Suspension for failure to properly inspect plant safety equipment and for discrepancies in recording time in the Oahe Project's work order system. Doc. 20 at ¶ 127; Doc. 24 at ¶ 100; Doc. 25 at ¶ 127. Newell filed a claim with the EEOC that this proposed suspension constituted racial discrimination, reprisal, and a hostile work environment. Doc. 20 at ¶ 128; Doc. 25 at ¶ 128. Stasch ultimately issued Newell a seven-day suspension for this conduct. Doc. 20 at ¶ 130; Doc. 25 at ¶ 130. Newell filed another EEO claim regarding this final suspension, which was consolidated with the first. Doc. 20 at ¶¶ 131–32; Doc. 25 at ¶¶ 131–32. The Army issued a FAD upholding Newell's suspension on January 17, 2017. Doc. 36 at ¶¶ 145, 148; Doc. 45 at ¶¶ 145, 148; Doc. 41-1 (text of FAD upholding suspension).

---

[5] The full statement, according to Newell, is "The outside investigation group will be comin' into the gate and they will be bringin' crucifixes and someone's gonn' be hung." Doc. 25 at ¶ 108; Doc. 20 at ¶ 108.

Colonel Cross, the commander of the Omaha District, flew to Pierre in the Summer of 2014 to meet with Stasch and Spiger about Newell's EEO complaints. Doc. 24 at ¶ 95. Newell was not able to meet with Colonel Cross during that visit. Doc. 24 at ¶ 96.

In August 2014, Newell requested to be trained for an Operator position and received approval for that training. Doc. 36 at ¶ 151; Doc. 45 at ¶ 151. Newell completed this training and was promoted to a full-time Power Plant Shift Operator position on October 2, 2016. Doc. 36 at ¶¶ 154–155; Doc. 45 at ¶¶ 154–155. Power Plant Shift Operators are the highest paid nonsupervisory position at the Oahe Project. Doc. 36 at ¶ 153; Doc. 45 at ¶ 153.

Newell believes that he is treated differently than other Corps employees of the Oahe Project and that he is subject to what he calls the "Newell Rules." Doc. 24 at ¶ 93. Magner indeed believes that the Corps would like to get rid of Newell, not because of Newell's race, but because of his repeated EEO filings. Doc. 24 at ¶ 140. Stasch reports that Spiger has expressed frustration with the Corps paying Newell so that Newell can sue the Corps, although Spiger denies making such a statement. Doc. 24 at ¶ 162. The January 2017 FAD found this statement did not constitute discriminatory harassment. Doc. 36 at ¶ 150; Doc. 45 at ¶ 150.

## II.    Summary Judgment Standard

Under Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment is proper when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." On summary judgment, the evidence is "viewed in the light most favorable to the nonmoving party." True v. Nebraska, 612 F.3d 676, 679 (8th Cir. 2010) (quoting Cordry v. Vanderbilt Mortg. & Fin., Inc., 445 F.3d 1106, 1109 (8th Cir. 2006)). There is a genuine issue of material fact if a "reasonable jury [could] return a verdict for either party" on a particular issue. Mayer v. Countrywide Home Loans, 647 F.3d 789, 791 (8th Cir. 2011). A party opposing a properly made and supported motion for summary judgment must cite to particular materials in the record supporting the assertion that a fact is generally disputed. Fed. R. Civ. P. 56(c)(1); Gacek v. Owens & Minor Distrib., Inc., 666 F.3d 1142, 1145 (8th Cir. 2012). "Mere allegations, unsupported by specific facts or evidence

beyond the nonmoving party's own conclusions, are insufficient to withstand a motion for summary judgment." Thomas v. Corwin, 483 F.3d 516, 527 (8th Cir. 2007); see also Reasonover v. St. Louis Cty., Mo., 447 F.3d 569, 578 (8th Cir. 2006) ("Evidence, not contentions, avoids summary judgment.") (internal quotations and citation omitted). Summary judgment is not "a disfavored procedural shortcut, but rather . . . an integral part of the Federal rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'" Celotex Corp. v. Catrett, 477 U.S. 317, 327 (1986) (quoting Fed. R. Civ. P. 1). Cases alleging discrimination are subject to the same summary judgment standard as any other case. Torgerson v. City of Rochester, 643 F.3d 1031, 1043 (8th Cir. 2011) (en banc).

## III. Race Discrimination

Newell argues that the Corps violated Title VII of the Civil Rights Act of 1964 by engaging in racial discrimination and retaliating against him for protected activities. Doc. 1 at 4–5; Doc. 1 at 6–8, CIV 14-3005-RAL. Title VII prohibits an employer from discriminating against employees with respect to their "compensation, terms, conditions, or privileges of employment, because of . . . race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). An employer is also prohibited from retaliating against an employee because the employee "opposed any practice made an unlawful employment practice by" the provisions of Title VII. Id. § 2000e-3(a). Newell can establish his Title VII race-based discrimination claims through direct evidence, or in the absence of direct evidence, through the McDonnell Douglas burden-shifting framework. McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973). Newell does not point to direct evidence of racial discrimination, but makes arguments using the McDonnell Douglas framework. See Doc. 26 at 3. In order for Newell's claims to survive a summary judgment motion, the McDonnell Douglas framework requires that Newell demonstrate a prima facie case of race discrimination. Macklin v. FMC Transp., Inc., 815 F.3d 425, 427–28 (8th Cir. 2016); Erenberg v. Methodist Hosp., 357 F.3d 787, 792–93 (8th Cir. 2004). If Newell establishes a prima facie case of race discrimination, the burden shifts to the Corps to show a legitimate, nondiscriminatory reason for the adverse action of which Newell complains. St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 506–07

8

(1993). If the Corps is able to do so, the burden shifts back to Newell to establish that the "legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." Reeves v. Sanderson Plumbing Prods., 530 U.S. 133, 143 (2000) (quoting Tx. Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 253 (1981)). Despite the burden-shifting nature of the McDonnell Douglas framework, the ultimate burden of proving unlawful discrimination remains with Newell. St. Mary's Honor Ctr., 509 U.S. at 507.

### A. Hostile Work Environment

As a portion of his race discrimination claim, Newell claims that the Corps has long subjected him to a hostile work environment. Doc. 1. at ¶ 46, CIV 14-3005-RAL; Doc. 1 at ¶ 33. To establish this claim, Newell must prove that "(1) []he is a member of a protected group; (2) []he was subject to unwelcome race-based harassment; (3) the harassment was because of membership in the protected group; and (4) the harassment affected a term, condition, or privilege of employment." Clay v. Credit Bureau Enters., Inc., 754 F.3d 535, 540 (8th Cir. 2014) (quoting Malone v. Ameren UE, 646 F.3d 512, 517 (2011)). The Corps can be liable for harassment by Newell's non-supervisory co-workers only if it "knew or should have known of the harassment and failed to take proper remedial action." Tatum, 408 F.3d at 550. In order to establish the fourth element, Newell must show that the harassment was "sufficiently severe or pervasive to alter the conditions of [his] employment and create an abusive working environment." Clay, 754 F.3d at 540 (quoting Malone, 646 F.3d at 517). This requires a finding that the environment was both one that "a reasonable person would find hostile and one that the victim actually perceived as abusive." Duncan v. Gen. Motors Corp., 300 F.3d 928, 934 (8th Cir. 2002). In determining whether a workplace is objectively hostile, courts must consider "all the circumstances, including the frequency of the discriminatory conduct, its severity, whether it is physically threatening or humiliating or a mere offensive utterance and whether the conduct unreasonably interfered with the employee's work performance." Singletary v. Mo. Dep't of Corr., 423 F.3d 886, 892–93 (8th Cir. 2005). "No single factor is required," and it "is not, and by its nature cannot be, a mathematically precise test." Harris v. Forklift Sys., Inc., 510 U.S. 17, 22–23 (1993).

In the previous order granting the Defendants' motion for summary judgment, this Court indicated that none of the Corps' actions presented by Newell which were reviewable at that time rose to the level of race discrimination or retaliation when viewed separately. Doc. 33 at 22. To properly evaluate Newell's hostile work environment claim this Court considers the totality of the work environment including matters previously ruled upon and matters not previously considered because of the EEO claims that were pending. Doc. 33 at 22. Although not every allegation made by Newell was the subject of an EEO complaint,[6] for purposes of evaluating a hostile work environment claim this Court can consider claims which were not filed as part of an EEO complaint as long as Newell put the Corps on notice of those claims. See Cottrill v. MFA, Inc., 443 F.3d 629, 635 (8th Cir. 2006) (finding administrative remedies had been exhausted on a hostile work environment sexual harassment claim even when additional evidence was provided beyond that formally noted in an EEO complaint because "the charged party was not deprived of notice of the charge"). The Corps has been put on notice of the various charges that Newell alleges created a hostile work environment, so this Court may consider incidents not included in Newell's EEO complaints for purposes of determining whether a hostile work environment existed.

Newell's hostile work environment claim weaves together events spread out over a decade. In examining Newell's claim in a holistic way, his allegations fall into two primary categories of conduct. The first category is an offensive culture that existed at the Oahe Project that Newell characterizes as a pervasive "good old boy" custom of making offensive remarks based on race, ethnicity, gender and religion. Doc. 46 at 9. The second category of conduct is described by Newell as his supervisors' willingness to misuse their power to impact the terms of his employment. Doc. 46 at 12. The conduct which falls within each of these categories, when viewed in totality, does not give rise to a viable hostile work environment claim.

---

[6] In particular, the events regarding the potential RIF and the comments to Magner not to share information with Newell, which he alleges are evidence of an effort to sabotage his career, Doc . 46 at 16, were not part of any EEO complaint filed by Newell.

## 1. Good Old Boys Environment

From the undisputed facts submitted to this Court and detailed in Part I of this opinion, Newell reported three instances of inappropriate language: the first lunchroom comments made in April of 2007, the lunchroom comments made by Magner and McCown in July of 2007,[7] and McCown's comments about burning crosses at a safety meeting in July of 2013.[8] When Newell reported the first lunchroom comments to his supervisor, that supervisor conducted a talk with the shop employees about inappropriate language in the workplace and had them watch a video produced by the EEOC. After reporting the second lunchroom comments, Magner and McCown received a verbal reprimand and the incident was documented. Newell also filed an EEO complaint after this second incident and eventually entered into a settlement with the Corps.[9] After McCown's comments at the safety meeting, Newell again filed an EEO complaint which was subsequently dismissed by the EEOC for failure to state a claim.

A few occurrences of racial epithets over a course of years will not preclude summary judgment in a hostile work environment claim. Singletary, 423 F.3d at 893. "To be actionable, such conduct must be shown to occur with such frequency that the very conditions of employment are altered and be viewed by a reasonable person as hostile." Id. The Eighth Circuit's case law demonstrates that Newell has not met this high bar. See, e.g., Bainbridge v. Loffredo Gardens, Inc., 378 F.3d 756, 759–60 (8th Cir. 2004) (finding a hostile work environment claim could not be sustained where the plaintiff, whose wife was Japanese, alleged his supervisors made racially offensive remarks about Asians at least once a month for

---

[7] Of the various comments reported by Newell in 2007, only one appeared to have been about him ("How was it growing up in the projects; did you experience this, this and this?"). Doc. 21-9 at 2. The other comments involved other ethnic groups such as Native Americans, Arabs, Filipinos, people living in Africa, and one instance of minorities in general ("Insurance keeps increasing because of minorities"). Doc. 21-9 at 2–3.

[8] Newell states that he complained to his supervisors about offensive racial remarks three times in 2007. Doc. 46 at 10. This third instance appears to be a suggestion by Newell to Bartels in December of 2007 that Bartels contact the EEOC "to see if they would provide direction because the issues were not resolved in the workplace as far as the environment." Doc. 27-6 at 17. In response, it appears that Bartels hung a sign in the lunchroom stating that offensive language was not to be used in the workplace. Doc. 27-6 at 17.

[9] Because Newell waived his right to pursue judicial action concerning the matters raised in his EEO complaint, Doc. 21-11 at 2, it is questionable whether this Court should even consider those instances in evaluating the hostile work environment claim. However, this Court finds that even with these instances of alleged harassment included, Newell's hostile work environment claim remains unviable.

two years); <u>Woodland v. Joseph T. Ryerson & Son, Inc.</u>, 302 F.3d 839, 843–44 (8th Cir. 2002) (finding that three instances where the plaintiff heard from a third party that racial epithets had been used to describe him and two instances where the plaintiff overheard co-workers use racial epithets to describe other African American employees, in addition to other "sporadic, racially-motivated misconduct" could not sustain a hostile work environment claim). Newell's allegations amount only to a few occurrences taking place in 2007 and 2013, not the kind of frequent conduct that would alter the conditions of employment.

In his brief opposing the Corps' motion for summary judgment, Newell alleges that he was subjected to "racially tinged" harassment throughout most of his employment, and that offensive slurs were a part of the culture at the Oahe Project. Doc. 46 at 10. Newell alleges that "[a] Corps manager acknowledged that [sic] the 'good old boy theory' that allowed 'good old boy language' in terms of offensive remarks about virtually every protected class of people to persisted [sic] in the Oahe Project workplace from the time that Newell was hired until that manager's retirement in 2014." Doc. 46 at 10. Newell's characterization of Richard Bartels's deposition testimony regarding the "good old boy" theory is inaccurate. Bartels testified that the good old boy theory was a practice of engaging in inappropriate behavior even when it was in violation of a rule; a practice which even Newell engaged in. Doc. 27-6 at 9. Bartels's testimony, when examined in totality, indicates there was a culture of sometimes crass behavior which the employees at the Oahe Project took part in, not that Newell was subjected to constant racial slurs. The contentions made by Newell in his briefing, as opposed to the facts submitted to this Court, do not prevent summary judgment. <u>See</u> <u>Reasonover</u>, 447 F.3d at 578 ("Evidence, not contentions, avoids summary judgment."). Newell also suggests that management had a "low level of commitment to preventing discriminatory harassment" which was "a hallmark of the culture at the Oahe Project workplace." Doc. 46 at 11. However, the undisputed facts submitted to this Court demonstrate that management took action on Newell's complaints; Newell's argument in his brief about those actions being inadequate does not constitute a genuine issue of material fact that precludes summary judgement.

## 2. Misuse of Power

Beyond the good old boy culture detailed above, Newell argues he "is able to offer unrefutable [sic] evidence that his supervisors were willing to misuse of [sic] their power to impact his terms of employment" in response to his EEO activity.[10] Doc. 46 at 12. The first example he cites is the fact that the other electric mechanic, Magner, was allowed the "minimally better opportunity to report to Spiger" while Newell was forced to report to McCown, who had been the subject of a previous EEO complaint by Newell. Doc. 46 at 13. In its previous order granting the Corps' motion for summary judgement in part, this Court noted that the record demonstrates Newell and Magner were subject to the same reporting requirements, and that Newell had failed to make a prima facie case that this requirement was evidence of discriminatory disparate treatment. Doc. 33 at 18-19.

Newell next alleges that the April 2013 Letter of Reprimand issued by Stasch against Newell for discussing the performance reviews of other employees, Doc. 21-29 at 4–5, was a misuse of his supervisors' power. Doc. 46 at 13. Newell contends that the Army has "officially and publicly" sided with Newell as to the question of whether this Letter was issued in retaliation for his EEO activities. Doc. 46 at 14. While the Army did issue a FAD concurring with the ALJ's direction to rescind the Letter of Reprimand, the Army also concurred with the ALJ's determination that Newell's conduct warranted disciplinary action in the form of a verbal reprimand. Doc. 21-31 at 10, Doc. 21-32 at 1. The fact that his discipline was determined to be too severe does not alter the fact that Newell's conduct warranted *some* discipline. The ALJ's determination that that Corps' issuance of the Letter constituted reprisal in

---

[10] In arguing that his supervisors misused their power, Newell alleges that Stasch, Spiger, and McCown all viewed Newell's EEO activity as a nuisance, and specifically points to testimony of Stasch regarding his thoughts on whether the EEO complaints at the Oahe Project would cease if Newell were gone. Doc. 46 at 15. Newell's argument appears to be that Stasch's testimony is evidence that management felt burdened by Newell's EEO activity and thus took actions against him to punish him for his complaints and deter further EEO activity. But Newell mischaracterizes Stasch's testimony on these points. Stasch stated that EEO complaints generate more workload for him. Doc. 27-4 at 103. This was a factual statement made in response to a question regarding his workload. And while Stasch testified that he had considered what the impact on EEO complaints at the Oahe Project would be if Newell left, he also stated that Newell is entitled to take actions he feels are necessary to protect himself. Doc. 27-4 at 127.

response to Newell's EEO activities is of course significant, but this is the only EEO claim on which Newell was granted any relief, and by itself does not amount to a hostile work environment.

In his briefing, Newell argues that his seven-day suspension for failing to inspect plant safety equipment and discrepancies in recording his hours was another misuse of his supervisors' power. Doc. 46 at 14. He notes several specific aspects: Spiger's initial recommendation for a 30-day suspension, Stasch's reduction of that recommendation first to 14 days and then to seven days "without consideration of the recommended range of discipline,"[11] and the timing of Stasch's final issuance of the seven-day suspension.[12] Doc. 46 at 14–15. As discussed in section IV below, the suspension did not amount to unlawful retaliation against Newell for his participation in EEO activities. Newell's conduct— failing to properly inspect the fire extinguishers, wash stations, and first aid kits, while recording time spent on the task—warranted some sanction. The fact that this sanction was discussed as 30 days and then 14 days before a seven-day suspension was imposed is not evidence of racial discrimination. In his deposition testimony, Stasch stated that he had eventually imposed a seven-day suspension because he decided to treat this as a stand-alone offense, rather than wait to see if the Army planned to appeal the ALJ's decision regarding the Letter of Reprimand. Doc. 27-4 at 104–105. Had the Letter of Reprimand remained in Newell's personnel file, a heavier sanction than the seven-day suspension would have been warranted. Doc. 27-4 at 106. Stasch ultimately decided not to wait any further for a decision from the Army and issued the suspension without consideration of any previous disciplinary sanctions because of his concern regarding the timeliness of imposing punishment on Newell for conduct that took place six

---

[11] Newell appears to be referencing the fact that Stasch did not personally engage in a comparative analysis of the disciplinary sanctions he had previously imposed on employees at the Oahe Project when determining Newell's punishment for this particular offense. However, while Stasch may not have conducted this analysis, he testified that he inquired with Human Resources about whether the proposed suspension "was in line with other disciplinary actions across the district for this type of offense." Doc. 27-4 at 107. Inquiring with Human Resources as to the appropriate level of punishment for Newell's offense, rather than making the determination on his own, is not evidence of discrimination.

[12] Newell alleges that Stasch issued the suspension one day after the Army upheld the ALJ's decision regarding the 2013 Letter of Reprimand, and that this is evidence of Stasch's intent to humiliate Newell and "chill interest in participating in the EEO process." Doc. 46 at 14, 22. However, Newell's contention is incorrect. Stasch issued the seven-day suspension on January 8, 2015, Doc. 20 at ¶ 130; Doc. 25 at ¶ 130, which was the day before the Army issued its FAD concurring with the ALJ's decision regarding the Letter of Reprimand. Doc. 21-32.

months prior. Doc. 27-4 at 106. Newell ultimately received a sanction that was commensurate with his conduct, a decision which the Army affirmed. Doc. 41-1.

Newell also argues that the site visit to the Oahe Project by Colonel Cross, the District Commander, gives rise to a reasonable inference that Newell's EEO complaints were considered a serious problem for his supervisors. Doc. 46 at 15. Newell has previously indicated that Colonel Cross was supposed to meet with Stasch, Spiger, and Newell to discuss Newell's EEO complaints, but because Newell was unavailable Cross only heard Stasch and Spiger's perspectives. Doc. 24 at ¶¶ 95–97. The facts belie that Colonel Cross's visit somehow supports Newell's arguments and claims. Newell emailed Colonel Cross on July 22, 2014, and stated he was being subjected to harassment. Consequently, Colonel Cross flew to the Oahe Project and met with leaders there to conduct an investigation, concluding that the actions taken by leadership at the Oahe Project were not the result of retaliation. Doc. 41-1 at 11. The only reasonable inference that can be derived from the facts presented here is that Colonel Cross takes allegations of harassment seriously. Newell's argument that this visit represents something more does not provide a basis upon which to deny summary judgment. See Reasonover, 447 F.3d at 578 ("Evidence, not contentions, avoids summary judgment.").

Newell alleges that his supervisors attempted to sabotage his career and placed the community served by the Oahe Dam at risk by instructing Magner, the other electronics mechanic, not to share information with Newell in anticipation of an upcoming RIF. Doc. 46 at 16; Doc. 26 at 20–21. Evaluating whether this claim amounts to racial discrimination and retaliation is beyond this Court's review because Newell has not filed a complaint with the EEOC regarding this matter, thus his administrative remedies have not been exhausted. See Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 110–115 (holding that administrative exhaustion is required for each discrete instance of discrimination or retaliation because, unlike a hostile work environment claim, they are readily identifiable). However, this Court will consider the facts available to it regarding this allegation in evaluating Newell's hostile work environment claim.

A memorandum was circulated indicating that the Oahe Project had more electronics mechanics than it needed, and to prevent anyone from losing their job one of the electronics mechanics would be reassigned to the electric shop or mechanics shop. Doc. 28-1. Both Spiger and Bartels testified that they believed Magner was the most qualified electronics mechanic. Doc. 27-3 at 55; Doc. 27-6 at 29. Because of his disabled veteran status, Newell would have been retained over Magner in the event of a RIF. Doc. 27-6 at 29. Bartels apparently told Magner not to share his knowledge regarding maintenance of relays in an effort to reassure him that he would have a job despite the RIF. Doc. 27-6 at 29–31. Spiger denies ever telling Magner not to share his knowledge with Newell. Doc. 27-3 at 55. Instead, Spiger testified that in response to Magner asking him why Newell received better evaluations than he did, Spiger explained that it was because Magner does most of the work for Newell and that he should just do his own job, allow Newell to do his, and let the evaluations reflect "a differential shown on knowledge." Doc. 27-3 at 54.

Newell argues in his brief that Bartels attempted to "engineer a different result" regarding the potential RIF whereby Magner would help him undermine Newell's performance and "Magner would become the more qualified employee." Doc. 46 at 16. But Bartels already believed Magner was the more qualified electronics mechanic. Doc. 27-6 at 29. Bartels testified that he believed Magner did not have to train Newell on relay testing because both had been to several weeks of training for that task. Doc. 27-6 at 30. When read in context, Bartels's goal appears to have been an outcome where the Oahe Project would have had Magner continue doing the relay testing while working in a different shop, the skill about which Bartels apparently told Magner not to share information with Newell, and Newell would have remained an electronics mechanic and had purview over all non-relay tasks. Doc. 27-6 at 30-31. Magner felt uncomfortable with the guidance received from Bartels and perhaps from Spiger as well, and contacted the EEOC, but did not file a formal complaint. Doc. 27-5 at 27. Stasch was contacted by the EEOC regarding Magner's concerns. Doc. 27-4 at 51. Stasch was advised by the EEOC to ascertain what exactly had happened, because there were potentially severe implications regarding the situation due

to the racial difference between Magner and Newell.[13]  Doc. 27-5 at 54.  Stasch learned that Bartels and

Spiger's version of events was "somewhat similar but different" than Magner's version.  Doc. 27-4 at 56.

Magner claims that he felt the EEOC had "thrown him under the bus" by relating his concerns to Stasch,

and he subsequently wrote a letter to the Inspector General detailing his version of events.  Doc. 27-5 at

27–28.  No RIF was implemented and Newell is now a Power Plant Shift Operator, having completed the

requisite training.  Doc. 36 at ¶¶ 151–156; Doc. 45 at ¶¶ 151–156.

The last concrete incidents that Newell argues contributed to a hostile work environment are the

creation of a work order titled "John Newell litigation" and a vulgar statement made by Spiger to

Newell's co-worker that Newell would not be paid to sue the Corps.  Doc. 46 at 18.  Regarding the work

order, the Army allows some official time for employees participating in EEO activities and Title VII

litigation, and the Oahe Project creates labor charge codes to document employees' time participating in

those activities.  Doc. 20 at ¶ 137; Doc. 25 at ¶ 137.  In January 2015, Stasch created a work order in the

FEMS system entitled "John Newell litigation" for Magner and McCown to document their time away

from work for depositions in Newell's current case.  Doc. 20 at ¶ 138; Doc. 25 at ¶ 138.  When Newell

discovered the work order he alleged that title was discriminatory and created a hostile work environment,

so Stasch renamed the work order "litigation."  Doc. 20 at ¶ 139; Doc. 25 at ¶ 139.  Only McCown and

Magner received emails indicating they should charge their time to this work order.  Doc. 21-41 at 6.

Newell acknowledges that news of his federal lawsuit had been published in at least three newspapers and

posted to the internet.  Doc. 41-1 at 13.

As for the vulgar comment, Newell's co-worker John Herbert (Herbert) had volunteered to enter

Newell's time into the FEMS system while Newell was participating in his litigation against the Corps.

Doc. 27-4 at 113.  Herbert sought guidance regarding how Newell's time in litigation should be recorded,

---

[13] Stasch testified that he learned from the EEOC that the information Magner relayed to them had the implication that "we were trying to set up John [Newell] for failure."  Doc. 27-4 at 51.  The "severe implications" Newell discusses in his brief, Doc. 46 at 17, are those that would arise if in fact management at the Oahe Project was attempting to undermine the black electronics mechanic (Newell) in favor of the white electronics mechanic (Magner).  This potential issue is the reason that the EEOC advised Stasch to ascertain the facts regarding Magner's reported concerns.  Doc. 27-4 at 54.

and Stasch and Spiger were informed that the Army does not pay employees for the time used to litigate their Title VII claims against the United States government. Doc. 27-4 at 113–114. Spiger then went to Herbert and informed him that "[t]he Corps of Engineers is not going to pay John Newell to f...ing sue them."[14] Doc. 25 at ¶ 139; Doc. 27-4 at 115. Newell claims these are facts which show his supervisors "sought opportunities to demean, ostracize and humiliate [him] in the workplace in an effort to have him move on or at least give up on the EEO process." Doc. 46 at 18.

Newell's arguments do not present a triable issue regarding a hostile work environment. Stasch needed a work order for the Corps employees to document their time spent on Newell's case. Newell has provided no evidence that Stasch was motivated by racial animus, or that the work order altered a condition of Newell's employment. His lawsuit was a matter of public record, reported by the media in several forums. Its existence was no secret to Corps employees that might have seen the FEMS entry. The fact that Stasch renamed the work order after being contacted by the EEOC shows only that he was willing to accommodate Newell's concerns. Spiger's comment to Herbert was a factual statement, albeit one with a vulgarity. Herbert had inquired how he should record Newell's time, and it is a fact that the Army will not pay Newell for his Title VII litigation against the Corps. Doc. 20 at ¶ 137; Doc. 25 at ¶ 137.

As a final matter, Newell's other claims of racial discrimination and retaliation, which this Court addressed in its previous order granting the Corps' motion for summary judgment, Doc. 33, are also taken into consideration now in evaluating Newell's hostile work environment claim. Having considered the totality of Newell's work environment,[15] this Court finds that Newell's allegations do not, as a matter of

---

[14] In his deposition testimony, Spiger denies ever having made this statement. Doc. 27-3 at 79. In considering the Corps' motion for summary judgment regarding Newell's hostile work environment claim, this Court takes the facts in the light most favorable to Newell and assumes for purposes of this Opinion and Order that the statement was made using the full form of the vulgarity.

[15] Newell also argues that the testimony of two of his co-workers that he was subject to unusual scrutiny and that management wanted to get rid of him is further evidence supporting his hostile work environment claim. Doc. 46 at 18; see also Doc. 24 at ¶ 164. But aside from their general contentions, no evidence, other than what this Court has detailed above, has been offered to support this claim. These statements, therefore, do not preclude summary judgment. See Reasonover, 447 F.3d at 578 ("Evidence, not contentions, avoids summary judgment.").

law, constitute harassment that can support a hostile work environment claim. Even if this Court were to assume, contrary to the testimony of Corps employees, that conduct and statements were in fact efforts to undermine Newell's performance, Newell still cannot show as a matter of law harassment so pervasive and severe that it altered the conditions of his employment and created a hostile work environment. Clay, 754 F.3d at 540. Newell would have been retained in the event of a RIF due to his disabled veteran status. While Newell claims that he decided to train for a higher paid position as a Power Plant Shift Operator because he felt defeated by management's efforts to undermine him, Doc. 24 at ¶ 137, a reasonable person in his position would not objectively perceive Newell's workplace to be hostile. See Duncan, 300 F.3d at 934.

The Eighth Circuit's decision in Bradley v. Widnall, 232 F.3d 626 (8th Cir. 2000), abrogated on other grounds by Torgerson, 643 F.3d 1031, is illustrative of why Newell's claim does not survive summary judgment. In Bradley, the plaintiff alleged she had been subjected to a hostile work environment when her supervisor "made various negative comments in her regard, removed much of her decision-making authority, encouraged her employees to bypass the chain of command, gave white employees preferential treatment, instructed employees to spy on her activities, had disparaging memos placed in her file, attempted to 'set her up' to fail a hospital inspection, and generally treated her in a disrespectful and discriminatory manner." Id. at 630. The Eighth Circuit affirmed the district court's grant of summary judgment, holding that while the "conduct cited by [plaintiff] may have resulted in a frustrating work situation," it was not "so severe or pervasive as to have affected a term, condition, or privilege of employment." Id. at 631–32. Like the plaintiff in Bradley, Newell's allegations constitute at most a "frustrating work situation" and not harassment that affected a term or condition of his employment. Accordingly, the Corps is entitled to summary judgment on Newell's hostile work environment claim.

### B. Constructive Discharge

Newell argues in his briefing that he was subject to a constructive discharge because of the culmination of retaliatory actions and race discrimination at the Corps. Doc. 26 at 16–17. The Corps

argues that Newell has failed to exhaust his administrative remedies with respect to his constructive discharge claim. Doc. 35 at 19–20. "A plaintiff will be deemed to have exhausted administrative remedies if the allegations of the judicial complaint are like or reasonably related to the administrative charges that were timely brought." Anderson v. Block, 807 F.2d 145, 148 (8th Cir. 1986) (internal citation omitted). While Newell cites to the events regarding the RIF as contributing to his constructive discharge, he also argues that the race discrimination, retaliatory actions, and the buildup of disciplinary actions in his file all laid the foundation for his constructive discharge. Doc. 24 at ¶ 137; Doc. 26 at 16–17. Newell's allegations regarding the events surrounding the RIF are reasonably related to the various claims he included in his EEO complaints. Therefore, he is deemed to have exhausted his administrative remedies and this Court has subject matter jurisdiction over his constructive discharge claim.

"Title VII encompasses employer liability for a constructive discharge." Pa. State Police v. Suders, 542 U.S. 129, 143 (2004). Constructive discharge under Title VII can be a "compound claim" that joins with either harassment or hostile work environment. Id. at 147. But, "[h]ostile work environment and constructive discharge claims may be wholly distinct causes of action under Title VII," because although "a hostile work environment can form the basis for a constructive discharge allegation, hostile work environment discrimination can exist absent a tangible employment action." Winspear v. Cmty. Dev., Inc., 574 F.3d 604, 607 (8th Cir. 2009) (internal quotation and citations omitted); see also Pa. State Police, 542 U.S. at 147 ("A plaintiff who advances such a compound claim must show working conditions so intolerable that a reasonable person would have felt compelled to resign."); Wilkie v. Dep't of Health and Human Servs., 638 F.3d 944, 954 (8th Cir. 2011) (finding that because a plaintiff's hostile work environment claim failed, and the plaintiff's constructive discharge claim was presented on the same evidence, it too failed); O'Brien v. Dep't of Agric., 532 F.3d 805, 811 (8th Cir. 2008) (same). "To establish a case of constructive discharge, [Newell] must show that (1) a reasonable person in [his] situation would find [his] working conditions intolerable, and (2) the employer intended to force [him] to quit." Rickard v. Swedish Match N. Am., Inc., 773 F.3d 181, 186 (8th Cir. 2014) (quoting Rester v. Stephens Media, LLC, 739 F.3d 1127, 1132 (8th Cir. 2014)) (internal quotations removed). The first

element is measured by an objective standard, not the subjective feelings of a plaintiff. Tatom v. Georgia-Pacific Corp., 228 F.3d 926, 932 (8th Cir. 2000). Evidence of the employer's intent may be proven "through direct evidence or through evidence that 'the employer...could have reasonably foreseen that the employee would quit as a result of its actions.'" Fercello v. Cty. of Ramsey, 612 F.3d 1069, 1083 (8th Cir. 2010) (quoting Wright v. Rolette Cty., 417 F.3d 879, 886 (8th Cir. 2005)).

Newell cannot establish either element. His constructive discharge claim is premised on the same allegations that are insufficient as a matter of law to establish his hostile work environment claim. As such, his claim fails on the first element. See Wilkie, 638 F.3d at 954; O'Brien, 532 F.3d at 811. See also, Howard v. Burns Bros. Inc., 149 F.3d 835, 841–42 (8th Cir. 1998) (discussing cases defining the types of conditions that render a workplace intolerable for constructive discharge claims). Moreover, there is no evidence in the record from which a jury could find an intent to compel Newell's resignation. There was no question that Newell would remain an electronics mechanic in the event of an RIF due to his disabled veteran status, a fact which he has admitted. Doc. 24 at ¶ 120; Doc. 45 at ¶ 157. Even if Bartels and Spiger intended to undermine Newell's performance, they could not engineer a result where Magner would be retained over Newell. Because they knew Newell was protected by disabled veteran status from the RIF, Bartels and Spiger could not have "reasonably foreseen that [Newell] would quit as a result of" their actions. Fercello, 612 F.3d at 1083. Thus Newell's claim fails on the second element as well.

Contrary to Newell's areguments, Newell's decision to become a Power Plant Shift Operator does not constitute a constructive discharge. The Operator position is the highest paid non-supervisory position at the Oahe Project, is higher paid than three of six supervisory positions, and with overtime is the highest paid position at the Oahe Project. Doc. 36 at ¶ 153; Doc. 45 at ¶ 153. Newell argues that he considers the move a constructive discharge because he lost pay during the two-year training period he had to undergo to obtain the Operator position, the position has difficult work hours relative to the electronics mechanic position, and an "advancement factor of zero." Doc. 45 at ¶¶ 153, 155. Newell's claim that he lost pay is premised on the fact that his training to become an Operator required him to

spend one year of time in grade for each trainee level. Doc. 36 at ¶ 152. He received the same pay as a trainee that he had received as a journeyman. Doc. 24 at ¶ 144. This alone does not amount to constructive discharge. Allen v. Bridgestone/Firestone, Inc., 81 F.3d 793, 797 (8th Cir. 1996) ("[A] reduction in pay does not necessarily constitute a constructive discharge."). A "change[] in employment that significantly affect[s] an employee's future career prospects" may amount to an adverse employment action, "but minor changes in working conditions that merely inconvenience an employee or alter an employee's work responsibilities do not." Sallis v. Univ. of Minn., 408 F.3d 470, 476 (8th Cir. 2005) (internal citation omitted). Beyond Newell's contention that his new position has "an advancement factor of zero," he has provided no evidence from which a jury could determine that his switch to a higher paid position as an operator has significantly affected his future career prospects. The difference in hours between his position as an Operator relative to when he was an electronics mechanic may be inconvenient, but it is not a constructive discharge. Accordingly, the Corps is entitled to summary judgment on Newell's constructive discharge claim.

## IV.    Retaliation

This Court previously granted the Corps' motion for summary judgment on Newell's retaliation claims except for the seven-day suspension, which was the subject of Newell's pending EEO complaint. The Army has issued a FAD upholding Newell's suspension, and this Court now grants the Corps' motion for summary judgment as it relates to Newell's retaliation claim based upon that suspension.

In July of 2013, Newell filed an EEO complaint alleging that his April 2013 Letter of Reprimand was the result of a hostile work environment, discrimination, and reprisal. Doc. 20 at ¶ 103; Doc. 25 at ¶ 103. In May of 2014, Newell's supervisor discovered Newell had recorded 69 hours since September of 2013 for inspections of safety equipment that had not taken place. Doc. 20 at ¶ 122; Doc. 25 at ¶ 122. Newell received a Notice of Proposed Suspension in June of 2014. Doc. 20 at ¶ 127; Doc. 25 at ¶ 127. On September 16, 2014, the ALJ ruled that Newell had put forth sufficient evidence to raise an inference of retaliation, and ordered the 2013 Letter of Reprimand rescinded. Doc. 20 at ¶ 105; Doc. 25 at ¶ 105. Newell's final seven-day suspension for the conduct discovered in May of 2014 was issued on January 8,

2015. Doc. 20 at ¶ 130; Doc. 25 at ¶ 130. The Army issued a FAD concurring with the ALJ's decision regarding the Letter of Reprimand on January 9, 2015. Doc. 20 at ¶ 107; Doc. 25 at ¶ 107.

Title VII establishes that it is "unlawful employment practice for an employer to discriminate against any of his employees . . . because he has opposed any practice made an unlawful employment practice . . . or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [Title VII.]" 42 U.S.C. § 2000e–3(a). While retaliation is prohibited, the filing of an "EEOC complaint does 'not insulate an employee from discipline for . . . disrupting the workplace.'" Wallace v. Sparks Health System, 415 F.3d 853, 858 (8th Cir. 2005) (quoting Kiel v. Select Artificials, Inc., 169 F.3d 1131, 1136 (8th Cir. 1999)). To establish his retaliation claim, Newell must first make a prima facie case of retaliation, that "(1) []he engaged in protected conduct; (2) a reasonable employee would have found the retaliatory action materially adverse; and (3) the materially adverse action was causally linked to the protected conduct." Musolf v. J.C. Penney Co., 773 F.3d 916, 918 (8th Cir. 2014) (citing Pye v. Nu Aire, Inc., 641 F.3d 1011, 1021 (8th Cir. 2011)). The burden on Newell to show that the complained-of materially adverse action was causally linked to the protected conduct is not difficult, with traditional principles of but-for causation to be applied. See Univ. of Tx. Sw. Med. Ctr. v. Nassar, 133 S. Ct. 2517, 2528 (2013) ("Title VII retaliation claims require proof that the desire to retaliate was the but-for cause of the challenged employment action."); Gross v. FBL Fin. Servs., Inc., 557 U.S. 167, 176 (2009); Musolf, 773 F.3d at 919. After establishing a prima facie case, the standard McDonnell Douglas burden shifting analysis applies. See Pye, 641 F.3d at 1021.

The parties agree that Newell's filing of complaints of race discrimination and retaliation under Title VII are protected actions under 42 U.S.C. § 2000e–3(a). The seven-day suspension constitutes an adverse employment action. McClure v. Career Sys. Dev. Corp., 447 F.3d 1133, 1137 (8th Cir. 2006) ("Suspending [plaintiff] without pay is an adverse employment action."). Therefore, Newell's retaliation claim turns on whether he can show a causal relationship between his suspension and his protected EEO complaint activities. A causal relationship, using the but-for causation standard, can be shown via a proximity in time between the protected activity and the adverse employment action, but can only be

relied upon for the sole indication of causality if the actions are "very close" in time. See Clark Cty. Sch. Dist. v. Breeden, 532 U.S. 268, 273 (2001) (per curiam); see also Univ. of Tx. Sw. Med. Ctr., 133 S. Ct. at 2528 ("Title VII retaliation claims require proof that the desire to retaliate was the but-for cause of the challenged employment action."); Gross, 557 U.S. at 176; Musolf, 773 F.3d at 919.

Newell argues the temporal proximity between the date his suspension was issued and the date that the Army affirmed the ALJ's decision regarding the Letter of Reprimand satisfies the third element of his prima facie case. Doc. 46 at 20. However, Newell's contention that the suspension was issued one day after the Army's decision is contradicted by the record. Stasch issued the suspension on January 8, 2015, and the Army issued the FAD concurring with the ALJ's decision one day later on January 9, 2015. Putting this error in Newell's assertion aside, Newell generally contends that because Stasch was considering whether the ALJ's decision would be appealed or upheld in determining the length of Newell's suspension, there is a causal link between his protected EEO activity and the adverse employment action. Doc. 46 at 21–22. This Court disagrees. During his deposition, Stasch testified that he had to wait on the Army's decision regarding the ALJ's ruling because whether the Letter of Reprimand stayed in Newell's file or not would impact the length of the suspension that could be imposed on Newell. Doc. 27-4 at 105. Because he was concerned about punishing Newell for conduct that had taken place six months prior, Stasch decided not to wait any longer for an Army decision on the ALJ's ruling and treated the incident as a stand-alone action, imposing a seven-day suspension for Newell's failure to properly inspect plant safety equipment and time discrepancies rather than a 14-day suspension. Doc. 27-4 at 106.

Despite Newell's contentions to the contrary, waiting to see if the Letter of Reprimand would remain in his file or not factored in determining whether Newell would receive progressive punishment for his latest disciplinary infraction. The EEO complaint regarding the Letter of Reprimand was filed in July of 2013, and his suspension for failing to inspect safety equipment while falsifying his time records was not proposed until 11 months later. Even the final suspension was issued nearly four months after the ALJ issued its ruling. The time between these events undermines Newell's proximity argument to assert

24

a causal link. Fercello, 612 F.3d at 1080 (finding a six-month gap between the protected activity and the adverse employment action "weakens the inference of causation"). Newell augments his argument by alleging that Stasch and Spiger's "repressive reaction to Magner" contacting the EEOC demonstrates their "hostile and punitive reaction to EEO activity" involving Newell. Doc. 46 at 22. As detailed in section III above, the record shows that Stasch was advised by the EEOC to ascertain the facts of the situation relating to Magner's concerns. Newell's statements notwithstanding, nothing about Stasch inquiring about the factual basis of Magner's concerns regarding a separate incident supports a causal link between Newell's EEO complaints and his suspension for failing to properly inspect plant safety equipment and falsifying his time records. "A party's unsupported self-serving allegation that [his] employer's decision was based on retaliation does not establish a genuine issue of material fact." Gibson v. Am. Greetings Corp., 670 F.3d 844, 857 (8th Cir. 2012) (quoting Jackson v. United Parcel Serv., Inc., 643 F.3d 1081, 1088 (8th Cir. 2011)).

Additionally, even if Newell had established a prima facie case of retaliation in his suspension, there is no genuine issue of material fact to show pretext in the Corps' proffered reason for the suspension. Newell attempts to establish pretext by asserting that he was disciplined for conduct that other employees regularly engage in without sanction, and that the severity of his suspension was disproportionately harsh in comparison to the disciplinary actions handed out for different offenses at the Oahe Project. Doc. 46 at 23–25. While "[i]nstances of disparate treatment can support a claim of pretext,...[Newell] has the burden of proving that [he] and [his co-workers] were similarly situated in all relevant respects." King v. Hardesty, 517 F.3d 1049, 1063 (8th Cir. 2008) (quotation omitted) abrogated on other grounds by Torgerson, 643 F.3d 1031; see also Putnam v. Unity Health Sys., 348 F.3d 732, 733–34 (8th Cir. 2003) (noting that to establish pretext, a plaintiff must "substantiate his allegations with sufficient probative evidence [that] would permit a finding in [his] favor based on more than mere speculation, conjecture, or fantasy") (alterations in original) (internal citation omitted). Newell has produced no evidence that his co-workers were "involved in or accused of the *same offense* and [were] disciplined in different ways," and consequently has failed to show that he and his co-workers "were

similarly situated in all relevant aspects." <u>King</u>, 517 F.3d at 1063 (emphasis in original) (internal citations and quotations omitted). The closest Newell comes to this standard is through his allegation that both he and Magner were jointly responsible for the fire extinguisher maintenance. Doc. 24 at ¶ 111; Doc. 46 at 23. But Newell has not alleged, nor has evidence been presented, that Magner falsely recorded time for fire extinguisher maintenance and inspections not performed. There is no evidence of record that any other employee at the Oahe Project was "involved in or accused of the same offense" for which Newell received his suspension. <u>King</u>, 517 F.3d at 1063. Instead, Newell essentially asks this Court to second-guess the business decisions of the Corps, and the Eighth Circuit has made clear "the employment-discrimination laws have not vested in the federal courts the authority to sit as super-personnel departments reviewing the wisdom or fairness of the business judgments made by employers, except to the extent that those judgments involve intentional discrimination." <u>Id.</u> (quoting <u>Hutson v. McDonnell Douglas Corp.</u>, 63 F.3d 771, 781 (8th Cir. 1995)). The evidence of record as a matter of law is insufficient to sustain Newell's retaliation claim, and the Corps is entitled to summary judgment.

## V.  Conclusion and Order

For the reasons stated above, it is hereby

ORDERED that the Defendants' Motion for Summary Judgment, Doc. 34, is granted.

DATED this 24ᵗʰ day of October, 2017.

BY THE COURT:

ROBERTO A. LANGE
UNITED STATES DISTRICT JUDGE